# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| TREVONTE JENKINS, | CASE NO. 1:20-CV-01211-SO |
| Plaintiff, | JUDGE SOLOMON OLIVER, JR. |
| v. | |
| WARDEN KIMBERLY CLIPPER, | MAGISTRATE JUDGE CARMEN E. HENDERSON |
| Defendant, | **REPORT & RECOMMENDATION** |

## I.   Introduction

Petitioner, Trevonte Jenkins, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Jenkins is an Ohio prisoner who is currently serving a 19-year prison term for his convictions for attempted murder, improperly handling firearms in a motor vehicle and having weapons under a disability. Jenkins asserts one due-process-related ground for relief: "Due process is violated when first-time, in-court identification is utilized as it is inherently suggestive and inherently unreliable." (ECF No. 1 at 6). Respondent, Warden Kimberly Clipper, filed a return of writ on July 20, 2020. (ECF No. 6). Jenkins filed a traverse on August 13, 2020. (ECF No. 7).

This matter was referred to me under Local Rule 72.2 to prepare a report and recommendation on Jenkins's petition and other case-dispositive motions. Because Jenkins's sole ground for relief is meritless, I recommend that the Court deny his petition in its entirety and not grant him a certificate of appealability.

## II.   Factual Background

The Ohio Court of Appeals for the Eighth Appellate District set forth the following facts[1] on direct appeal:

> {¶ 6} On October 7, 2016, the Beautiful Soulz festival, featuring local hip-hop artists, took place at the Phantasy club on Detroit Avenue in Lakewood, Ohio. Phantasy is part of a larger complex containing three separate bars and venues, including the Phantasy, the Symposium, and the Chamber.
>
> {¶ 7} Jonathan Bobak went to Phantasy that night after one of the performing artist's promoters hired him to take photographs of the event. Bobak testified that he went outside the complex to smoke a cigarette around 10:00 p.m. that evening.
> He stated that while outside, he saw Jenkins hit "a Caucasian female," who he believed to be Jenkins's girlfriend, multiple times on the sidewalk outside of the complex. Bobak testified that a number of men approached and beat up Jenkins for hitting his girlfriend and that he eventually intervened because the men were "really kind of roughing [Jenkins] up a bit" and figured that Jenkins had "learned his lesson." Bobak told Jenkins to go home and saw him walk toward Value World, which was a few hundred feet away from the complex. He testified that people visiting the complex typically park in the Value World parking lot for events.
>
> {¶ 8} According to Bobak, after Jenkins left, the woman who Jenkins had hit was a "mess," crying and slurring her words. He stated that the woman kept saying that she "needed to call [her] dude" and that she appeared to be under the influence "of something." Bobak eventually left to go back inside to the festival, and after working for another hour and a half, decided to leave and walked outside around 12:00 a.m. He testified that as he waited for his ride, he saw the same woman from earlier walking toward Value World and then get into the passenger side of a white vehicle parked in the businesses' parking lot. Bobak could not see who was driving the white vehicle. He stated that the vehicle exited the Value World parking lot, turned left on Detroit, and drove by the complex. He testified that he saw the vehicle's driver's-side window roll down right before gunshots were fired toward the complex and that upon realizing that it was gunfire, people began running into the complex. Bobak suffered a gunshot wound to his right leg during the incident,

---

[1] The facts found by the appellate court of record "shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 527 U.S. 1040 (1999).

and he testified that he received treatment for the wound a few hours later.

{¶ 9} Bobak also testified that law enforcement visited him later that day to look at a photo array. Bobak identified Jenkins in the photo array as the man involved in the fight with the woman that occurred earlier on the night of October 7 outside of Phantasy. At trial, Bobak stated that although he did not see the shooter, he assumed that Jenkins was the shooter after witnessing the woman get into the vehicle later after saying she needed to contact "her dude."

{¶ 10} George Trouche testified that he visited Phantasy on October 7, 2016, to perform at the music festival. He stated that toward the end of the night he was waiting outside for a ride when someone started shooting. He testified that he was standing outside in front of the complex when he heard the gunshots. He ran inside and later realized that he had been shot in the leg. At trial, Trouche admitted that he did not see where the shots were coming from or who the shooter was.

{¶ 11} Gregory Cunningham testified that he is the owner of G-Enforcement, a personal security company that staffs security guards for venues and celebrities. He stated that he, along with several of his employees, were at the complex that night, working the venues and the entrances. According to Cunningham, at one point during the evening, he was outside the complex and witnessed a "young man fighting a * * * white young lady." He testified that he saw the man punch the woman "at least" five times before he intervened and that some other men approached the young man and started fighting with him. Cunningham eventually intervened in the fight between the man and the other men, and after he broke up that fight, the man walked toward the Value World parking lot and got into a white four-door vehicle. He stated that after breaking up the fight, the woman, who seemed intoxicated, said that the man was her boyfriend.

{¶ 12} Cunningham testified that the woman asked him if she could use his cell phone to call her boyfriend so that he could come back and get her. Cunningham gave her his phone, retrieved it a few minutes later, and then went back inside Phantasy. A few minutes later, a number of people ran inside the complex shouting, "[H]e's out there shooting, the young man that drove away in the white car."

{¶ 13} While he was not outside when the shots were fired, Cunningham testified that he spoke to law enforcement when they arrived and viewed a photo lineup later that day. The lineup

3

administration form was presented at trial and shows that one of the six pictures is circled; the one that is circled is not Jenkins. When presented with the form at trial, Cunningham testified that he did not personally circle or initial the page with the pictures of the suspects. He testified that he told the officer that he recognized two men in the lineup, one of whom was Jenkins. He also told the officer that the men he identified were at Phantasy and that Jenkins was the man involved in the fight with the woman.

{¶ 14} John Eanes, Jr. testified that he worked as a security guard for G Enforcement, and that he was working Phantasy's front door all night. He testified that during the night, he witnessed a man and woman arguing and fighting a few feet away from Phantasy's entrance. He stated that they were screaming at each other for a few minutes when the man began hitting the woman. Eanes said that a group of men then approached the man and began fighting him and that eventually he and Cunningham intervened. He stated that after the fight was broken up, Jenkins walked toward the Value World parking lot and, a few minutes later, pulled out of the parking lot in a "white Ford Fusion."

{¶ 15} Eanes testified that the woman with whom Jenkins was fighting remained outside of Phantasy and seemed to be "high or something." He stated that the woman indicated that she needed a ride to Lorain County and that he radioed Cunningham to assist her. About two hours later, Eanes saw the white vehicle return and pull into the Value World parking lot. He also saw the woman walk toward Value World and testified that a short time later, the white vehicle pulled out and drove toward Phantasy. Eanes stated that as the vehicle approached Phantasy, he saw the vehicle's driver's-side window roll down, saw Jenkins's face, saw the woman in the passenger seat, and saw Jenkins point a gun out of the driver's-side window toward the group of people in front of Phantasy. He stated that there were about 20 people outside of Phantasy at that time and that he told everyone to get inside when the gunfire started.

{¶ 16} According to Eanes, he did not speak to the police because he told Cunningham what he witnessed and that Cunningham took the lead and said he would contact Eanes if he needed anything. Eanes testified that he did not speak to police until a few weeks before trial, months after the shooting. When asked why he did not give a statement to the police earlier, Eanes stated that he was not aware that the police had identified and caught the shooter.

{¶ 17} At trial, Eanes stated that he got a good look at both the man and the woman and that the lighting in the area outside of Phantasy

4

was good. He testified that he remembered the man who was fighting the woman and identified Jenkins as that man in court.

{¶ 18} Sadie Jones testified that she worked as a bartender at Phantasy that night and arrived around 7:00 p.m., parking her 2006 Ford Freestyle right in front of the entrance to the venue. During the shooting, Jones's vehicle was hit multiple times. Jones stated that her vehicle's rear tire was flat as the result of a gunshot, the driver's-side window was "shot out," her driver's-side door had a bullet hole, and her driver's-side headrest had a bullet hole.

{¶ 19} Sarah Super testified that she went to Phantasy on the night of October 7 with Jenkins, who was her boyfriend at the time, but as of the date of trial was her fiancé. She stated that they went to the club around 9:30 p.m. and that Jenkins drove them in a white four-door rental car and that they parked "around the corner from the club[.]" Super stated that she did not know the make or model of the vehicle.

{¶ 20} According to Super, she drank a Four Loko on the way to Phantasy and continued drinking at Phantasy and was heavily intoxicated. Because of this, Super explained that she did not recall getting into a verbal or physical altercation with Jenkins that night. When asked about the bruises that officers observed the next day at Super's house, Super testified that it was "probably" from her "drunk stumbling" that night and that she "probably fell down [her] steps[.]" Exhibits submitted by the state during Super's testimony showed bruises and scratches on Super's chin, neck, right eye, left cheek, lower back, arms, and elbow. Super stated that she did not have the bruises before going to Phantasy that night.

{¶ 21} Super testified that she did not remember leaving Phantasy and did not know how she got home that night. She blacked out and did not recall hearing any gunfire. Super stated that when she woke up the next morning, Jenkins was with her, and the white rental car they drove to Phantasy the night before was parked outside of her home. When shown a photograph of the rental vehicle, she confirmed that the vehicle's license plate was from Wisconsin and read 876XPZ. When shown another photograph of items found in the vehicle, Super identified one of the items as her wallet, but stated that she could not remember if she had her wallet on her person when she went to Phantasy on October 7.

{¶ 22} Officer Daniel Hilfiker testified that he was the officer who administered the photo lineup with Cunningham. He testified that Cunningham wrote on the form and circled the picture. The officer

5

was unclear as to what his instructions were. He stated that after reading Cunningham the instructions, he "showed him the pictures, and [ ] said if you see anybody you recognize, * * * just circle them, initial and date." Later, however, Officer Hilfiker agreed that the purpose of the photo lineup was to identify the shooter. He also testified that Cunningham only identified one individual, which was not Jenkins, and that he understood Cunningham's identification to be of the shooter.

{¶ 23} Officer Ariana Zuk of the Lakewood Police Department testified that she responded to a call of an incident at Phantasy on October 8 and, upon arriving, began identifying evidence at the scene. She testified that she discovered that the suspect shooter had been identified as a "[b]lack male who was with a white female[, who] * * * had left eastbound in a white four-door vehicle[.]" Officer Zuk stated that officers found a keychain with a tag at the scene that "came off of the suspected shooter" and contained the make, model, and year of the vehicle ("2015 HYUN ACNT"), the license plate number ("876XPZ"), and the vehicle's color ("white"). The tag also stated, "Average Key Replacement Cost $225."

{¶ 24} Laura Stanton testified that she is a forensic DNA analyst with the Cuyahoga County Medical Examiner's Office. She explained that based on her test of item four, which was a blood swab from the driver's seat of the white rental vehicle (later identified as a Hyundai Accent), Jenkins was the source of the DNA to a reasonable degree of scientific certainty.

{¶ 25} Officer Jeffrey Robinson of the Lakewood Police Department testified that he responded to the scene and took photographs of the evidence and that based on the bullet holes in Jones's vehicle, the shots were "coming from a moving object[.]" He admitted on cross-examination, however, that his conclusion was a general assumption based on his observations and was not the result of in-depth calculations concerning the bullet holes' angles.

{¶ 26} Sergeant Duane Brown of the Lakewood Police Department testified that he was in the police station that night when he received a request to check the traffic cameras for information related to a drive-by shooting that occurred outside of Phantasy. He said that he received a phone call about shots being fired around 12:46 a.m. He reviewed the footage and witnessed a white four-door sedan driving northbound on West 117th Street toward Phantasy around 12:41 a.m. He stated that another camera captured the same car heading westbound on Detroit Avenue toward Phantasy a minute later. At

6

trial, Sergeant Brown admitted that the cameras did not capture any part of the drive-by shooting.

{¶ 27} Detective Terry Miller of the Lakewood Police Department testified that he was assigned to investigate the shooting outside of Phantasy and reviewed the footage collected from the traffic cameras. He identified the suspect vehicle based on the keychain collected from the scene and observed the vehicle on the footage entering the city around 12:41 a.m. When asked about some of the witnesses' statements that the suspect vehicle was a Ford Fusion or Taurus, Detective Miller stated that he did not "put a lot of credence into that" because "[g]enerally, sedans that are all generic looking, anybody in my opinion can be confused[.]" Detective Miller stated that he was able to identify the vehicle's license plate information from a still photograph of the camera footage "[a]fter kind of zooming in and out."1 Detective Miller stated that he contacted Enterprise Rent-A-Car and learned that the vehicle was a 2015 Hyundai Accent that was rented to Jenkins from an Enterprise location in Elyria.

{¶ 28} Based on that information, Detective Miller explained that officers obtained an arrest warrant for Jenkins and a search warrant for the addresses where police believed Jenkins lived, one of which was Super's home in Elyria. According to Detective Miller, during the search of Super's home, as well as the search of the white rental vehicle parked outside of the home, officers located and photographed a ticket stub for the Beautiful Soulz festival on the weekend of October 7-8. Detective Miller stated that officers collected blood from the driver's seat vehicle of the car as well based on the fact that witnesses told officers that the shooter was in a fight earlier in the night and was "possibly bleeding." During the search, officers also collected some items of clothing, including a black T-shirt and a pair of blue jeans, which Super told officers that Jenkins wore to Phantasy on the night of the shooting. Further, when asked why officers did not contact Eanes right away, Detective Miller stated that officers "weren't aware that he existed as far as someone who had actually been a witness to the events."

*State of Ohio v. Jenkins*, No. 105881, 2018-Ohio-2397, ¶¶ 6-28 (8th Dist. Ohio June 21, 2018).

### III.  Relevant State Procedural History

7

**A.      Indictment**

Jenkins was indicted on January 29, 2016, for:

> Count 1: Attempted Murder, R.C. 2923.02/2923.02(A), felony of the first degree, with one-, three-, and five-year firearm specifications, a notice of prior conviction, and a repeat violent offender specification;
>
> Count 2: Attempted Murder, R.C. 2923.02/2923.02(A), felony of the first degree, with one-, three-, and five-year firearm specifications, a notice of prior conviction, and a repeat violent offender specification, a notice of prior conviction, and a repeat violent offender specification;
>
> Count 3: Felonious Assault, R.C. 2903.11(A)(2), felony of the second degree, with one-, three-, and five-year firearm specifications, a notice of prior conviction, and a repeat violent offender specification;
>
> Count 4: Felonious Assault, R.C. 2903.11(A)(2), felony of the second degree, with one-, three-, and five-year firearm specifications, a notice of prior conviction, and a repeat violent offender specification;
>
> Count 5: Discharge of a Firearm on or Near Prohibited Premises, R.C. 2923.162(A)(3), felony of the second degree, with one-, three-, and five-year firearm specifications;
>
> Count 6: Discharge of a Firearm on or Near Prohibited Premises, R.C. 2923.162(A)(3), felony of the second degree, with one-, three-, and five-year firearm specifications;
>
> Count 7: Improperly Handling Firearms in a Motor Vehicle, R.C. 2923.16(A), felony of the fourth degree, with one-, three-, and five-year firearm specifications;
>
> Count 8: Improperly Handling Firearms in a Motor Vehicle, R.C. 2923.16(B), felony of the fourth degree, with one-, three-, and five-year firearm specifications;
>
> Count 9: Having Weapons Under Disability, R.C. 2923.13(A)(2), felony of the third degree, with one-, three-, and five-year firearm specifications;

> Count 10: Criminal Damaging or Endangering, R.C. 2909.06(A)(1), misdemeanor of the first degree; and
>
> Count 11: Domestic Violence, R.C. 2919.25(A), misdemeanor of the first degree.

(ECF No. 6-1, Ex. 1). At arraignment, Jenkins plead not guilty to all charges. (ECF No. 6-1, Ex. 2).

      **B.**    **Motion in Limine**

On April 10, 2017, Jenkins moved to preclude State's witness John Eanes from providing an in-court identification of him as the shooter. (ECF No. 6-1, Ex. 3). Jenkins argued under *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375 (1972), that an in-court identification by Eanes would violate Jenkins's right to due process as Eanes had never provided an out-of-court identification. (ECF No. 6-1, Ex. 3). The State objected to the motion. (ECF No. 6-1, Ex. 4). The trial court heard further arguments on the motion prior to trial (ECF No. 6-3, PageID # 541-549) and conducted an in-camera identification hearing prior to allowing Eanes to testify (ECF No. 6-3, PageID #: 742-771). The following day, the trial court overruled the motion in limine. (ECF No. 6-4, PageID #: 775-779). Jenkins reasserted his objection to the in-court identification during trial. (ECF No. 6-5, PageID #: 1190).

      **C.**    **Guilty Verdict**

Jenkins waived his right to a jury trial as to the counts for having weapons while under disability, the notices of prior conviction, and repeat violent offender specifications. (ECF No. 6-1, Ex. 5). A jury trial began on April 25, 2017. On May 2, 2017, the jury convicted of all eleven counts in the indictment. (ECF No. 6-1, Ex. 8). The trial judge convicted Jenkins on each of the specifications. (ECF No. 6-1, Ex. 8). On May 10, 2017, the trial court sentenced Jenkins to a total nineteen years of incarceration. (ECF No. 6-1, Ex. 9).

### D. Direct Appeal

On appeal, Jenkins raised six assignments of error, only one of which is relevant to this appeal:

> ASSIGNMENT OF ERROR I: Appellant was Denied a Fair Trial where an In-Court Identification was Impermissibly Suggestive.

(ECF No. 6-1, Ex. 11).

On this assignment of error, the Ohio Court of Appeals concluded that "that Eanes had a reliable and independent basis for identifying Jenkins as the shooter." *Jenkins,* 2018-Ohio-2397, ¶ 40. The appellate court further stated that it did not find "that Eanes's in-court identification denied Jenkins his right to a fair trial or that the trial court abused its discretion in admitting that evidence." *Id*. Accordingly, the court overruled Jenkins's first assignment of error. *Id*.

Ultimately, the Ohio Court of Appeals affirmed Jenkins's conviction and sentence. *Id.* at ¶ 84. Jenkins moved the Ohio Court of Appeals to reconsider, but it declined to do so. (ECF No. 6-1 at Exs. 14, 16).

### E. Appeal to the Ohio Supreme Court

On August 2, 2018, Jenkins appealed through counsel to the Ohio Supreme Court. (ECF No. 6-1, Ex. 17, 18). Jenkins's memorandum in support of jurisdiction raised the following proposition of law:

> **Proposition of Law:** When identification is an issue at trial, the Due Process Clauses of the Ohio and United States Constitutions prohibit the admission of an in-court identification if it is not preceded by an out-of-court identification procedure.

(ECF No. 6-1 at Ex. 18). On October 24, 2018, the Ohio Supreme Court declined jurisdiction. (ECF No. 6-1, Ex. 20).

10

    **F.**    **Petition for Writ of Certiorari**

On January 18, 2019, Jenkins filed a pro se petition for a writ of certiorari to the Supreme Court of the United States, raising the following question: "Is a petitioner denied due process of law and a fair trial when identification was at issue at trial and there was a flawed process related to a first-time in-court identification at trial by the State's only witness?" (ECF No. 6-1, Ex. 21). The State opposed the petition. (ECF No. 6-1, Ex. 22). On June 3, 2019, the Supreme Court denied the petition for a writ of certiorari and on August 5, 2019, the Court denied rehearing. (ECF No. 6-1, Exs. 23, 25).

**IV.**    **Federal Habeas Corpus Petition**

On June 2, 2020, Jenkins petitioned through new counsel that this Court issue a writ of habeas corpus. (ECF No. 1). Jenkins asserted the following ground for relief:

> **Ground One:** Due process is violated when first-time, in-court identification is utilized as it is inherently suggestive and inherently unreliable.
>
> **Supporting Facts:**
>
> 1) This petition is being raised pursuant to 28 USC § 2254(d)(1), as the State Court's holding is contrary to and involved an unreasonable application of clearly established United States' Supreme Court precedent.
>
> 2) The Trial Court abused its discretion when it permitted the use and admission of unduly suggestive identification procedures.
>
> 3) The Supreme Court of the United States holds that an identification derived from unnecessarily suggestive procedures, which have a likelihood of leading to a misidentification, violate a defendant's due process. *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).
>
> 4) A two-step process should be used to determine the admissibility of identification testimony. First, the court must decide whether the identification was impermissibly suggestive. If the identification was suggestive, the court must determine if the identification was

11

reliable and there was not a substantial likelihood of irreparable misidentification. *Mason v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

5) "It is obviously suggestive to ask a witness to identify a perpetrator in the courtroom when it is clear who is the defendant." *U.S. v. Rogers*, 126 F.3d 655 (5th Cir. 1997). Citing *U.S. v. Archibald*, 734 F.2d 938, 941, 943 (2d Cir. 1984); *U.S. v. Hill*, 967 F.2d 226, 232 (6th Cir. 1992); *U.S. v Rundell*, 858 F.2d 425, 427 (8th Cir. 1988).

6) There are five factors to be considered in determining the likelihood of misidentification: 1) the opportunity of the witness to observe the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description; 4) the witness's level of certainty and 5) the time between the crime and the identification. *Biggers* at 199.

7) The *Biggers* analysis applies to first-time in-court identification when an eyewitness has never before positively identified the defendant in person. "All of the concerns that underlie the *Biggers* analysis, including the degree of suggestiveness, the chance of mistake, and the threat to due process are no less applicable when the identification takes place for the first time at trial." *U.S. v. Thomas*, E.D. Michigan No. 15-20487, 2015 U.S. Dist. LEXIS 165474 (Dec. 10, 2015). *See also U.S. v. Hill*, 967 F.2d 226 (6th Cir. 1992).

8) In Petitioner's case, during the investigation, none of the eyewitnesses were able to identify Jenkins as the shooter after reviewing a photo lineup during pre-trial procedures. In fact, one of the other witnesses identified one of the line-up fillers when presented with the photo array. John Eanes, the witness who identified petitioner at trial, was learned about later in the investigation but was never questioned by police before trial. Mr. Eanes was never asked to make an out of court-identification. The first time Mr. Eanes identified Petitioner was during his testimony at trial on direct examination.

9) The *Biggers* factors weigh in favor of exclusion. Mr. Eanes testified at trial that he saw Petitioner but once he saw a gun he turned his back. Tr. 697. Mr. Eanes' degree of attention is certainly in question. Mr. Eanes also testified that the shooter was wearing a red shirt, however, the evidence deduced at trial indicated that Petitioner was wearing a black shirt. Similarly, there was no prior description provided by Mr. Eanes as he only first identified

>Petitioner at trial. In fact, during a pre-trial hearing on the admissibility of his testimony, Mr. Eanes denied seeing Petitioner in the courtroom. Tr. 254-255. The incidents in this case happened on October 8, 2016, and Mr. Eanes was not asked to make any type of identification until April 2017. The length of time between the alleged crime and the identification certainly calls into question the reliability of the identification. The *Biggers* factors weigh heavily in favor of exclusion and the first-time, in-court identification of Petitioner should have been excluded.
>
>10) Petitioner's due process rights were violated by the admission of the unduly suggestive identification procedures utilized in this case.

(ECF No. 1 at 18-20).

## V. Legal Standards

### A. Jurisdiction

28 U.S.C. § 2254(a) authorizes district courts to entertain an application for a writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court." A state prisoner may file a § 2254 petition in the "district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him." 28 U.S.C. § 2241(d). The Court of Common Pleas of Cuyahoga County sentenced Jenkins, and Cuyahoga County is within this court's geographic jurisdiction. Accordingly, this Court has jurisdiction over Mason's § 2254 petition.

### B. Cognizable Federal Claim

Under 28 U.S.C. § 2254(a), a state prisoner may challenge his custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A petitioner's claim is not cognizable on habeas review if it "presents no federal issue at all." *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991). Thus, "errors in application of state law … are usually not cognizable in federal habeas corpus." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007)

13

(citing *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983)); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."). A federal habeas court does not function as an additional state appellate court; it does not review state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (citing *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987)). Instead, "federal courts must defer to a state court's interpretation of its own rules of evidence and procedure" in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th 1998).

    **C.**    **AEDPA Standard of Review**

Jenkins's ground for relief invokes review pursuant to 28 U.S.C. § 2254(d)(1). Title 28 U.S.C. § 2254(d)(1), as amended by the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), provides as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;

To determine whether relief should be granted, the Court must use the "look-through" methodology and look to the "last explained state-court judgment" on the petitioner's federal claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them no effect—which simply 'looks through' them to the last reasoned decision—most nearly reflects the role they are ordinarily

14

intended to play."); *Wilson v. Sellers*, 138 S. Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.").

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotations and citations omitted). "[U]nder the unreasonable application clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"—it must be "objectively unreasonable." *Id*.

For state prisoners, the § 2254(d) standard "is difficult to meet… because it is meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). This is because, "[a]s amended by AEDPA, § 2254(d) is meant only to stop short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id*. 103. "It preserves authority to issue the writ in cases where there is no possibility [that] fairminded jurists could disagree that the state courts decision conflicts with this Court's precedents" and "goes no further." *Id*. Thus, in order to obtain federal habeas corpus relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well

15

understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*.

## VI. Discussion

In his sole ground for relief, Jenkins argues that his right to due process was violated when the trial court allowed first-time, in-court identification of Jenkins because "there was a likelihood of misidentification from the unnecessarily suggestive procedure." (ECF No. 7 at 4). Jenkins relies on *Mason v. Brathwaite*, 432 U.S. 98 (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972) and its progeny to support his argument. Relying on *Perry v. New Hampshire*, 565 U.S. 228, 233 (2012), the Warden argues that *Biggers* does not apply because Jenkins cannot demonstrate that Eanes's identification of Jenkins was obtained through police misconduct. (ECF No. 6 at 17). Jenkins argues that *Perry* does not apply because he "has demonstrated identification under suggestive circumstances because of misconduct." (ECF No. 7 at 8).

The proper initial inquiry is not whether the underlying court properly applied *Biggers*, but instead whether *Mason* and *Biggers* apply at all. Here, Jenkins attempted to preclude an in-court identification of him where there was *no prior pre-trial identification*. Jenkins acknowledges there was no pre-trial identification by Eanes. (ECF No. 7 at 7). Jenkins's claim must fail because no clearly established Supreme Court precedent extends *Manson* and *Biggers* to in-court identifications untainted by any prior improper identification; thus, the state court could not have unreasonably applied federal law. *See Wright v. Van Patten*, 552 U.S. 120, 125–26, 128 S.Ct. 743, 746–47, 169 L.Ed.2d 583 (2008) (holding that state court could not have unreasonably applied federal law if no clear Supreme Court precedent existed); *Chappell v. McKee*, No. 1:11–CV–1342, 2012 WL 1229382, at *3 (W.D.Mich. Mar. 22, 2012) (interpreting *Perry* to mean that "there is no Supreme Court decision clearly establishing a right to a judicial finding on reliability arising from

16

an identification made at a preliminary hearing (as opposed to an identification orchestrated by police)"), accepted by 2012 WL 1229128 (W.D. Mich. Apr.12, 2012); *see also Carter v. Skipper*, No. 20-CV-12391, 2022 WL 286179, at *5 (E.D. Mich. Jan. 31, 2022).

In *Carter*, the court explained that:

> Although the Sixth Circuit in [*United States v. Hill*, 967 F.2d 226 (6th Cir. 1992)] held that the *Biggers* analysis for suggestive identifications applies to identifications made for the first time in court, *see Hill*, 967 F.2d at 232, Sixth Circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court" and thus "cannot form the basis for habeas relief under [the] AEDPA." *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012). This Court notes that "the Supreme Court has never held that an in-court identification requires an independent basis for admission in the absence of an antecedent improper pre-trial identification." *Cameron v. Birkett*, 348 F. Supp. 2d at 843. Moreover, "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Perry*, 565 U.S. at 248. Admission of DR's in-court testimony against Petitioner would not be grounds for habeas relief because there are no Supreme Court cases that have extended the protections of *Biggers* and its progeny to cases where the eyewitness first identifies the petitioner in court. *See Luckett v. Adams*, 200 F. App'x 703, 704 (9th Cir. 2006). Indeed, "[n]one of these cases has set any guidelines for in-court identification procedures nor indicated that in-court identification must be made in a way that is not suggestive." *Id.* (citing to *United States v. Domina*, 784 F.2d 1361, 1368 (9th Cir. 1986)). "The Supreme Court has not extended its exclusionary rule to in-court identification procedures that are suggestive because of the trial setting." *Domina*, 784 F.2d at 1369.

*Carter*, 2022 WL 286179, at *5.

Since *Perry*, circuits have debated whether or not the decision "overruled circuit-level precedent requiring inquiries into the suggestiveness and reliability of in-court identifications." *United States v. Thomas*, 849 F.3d 906, 910 (10th Cir. 2017) (collecting cases from the First, Seventh, Tenth, and Eleventh Circuits). The Sixth Circuit has also reexamined its decision in *Hill*

17

in *United States v. Hughes*, 562 F. App'x 393, 398 (6th Cir. 2014). In *Hughes*, eyewitnesses to four restaurant robberies identified a defendant as the robber when asked whether the robber they saw was present in the courtroom. *Id*. The Sixth Circuit reasoned that the procedure was not so impermissibly suggestive as to violate defendant's due process rights. *Id*. The Sixth Circuit noted:

> Further, the Supreme Court has recently made clear that due process rights of defendants identified in the courtroom under suggestive circumstances are generally met through the ordinary protections in trial. *Perry v. New Hampshire*, — U.S. —, 132 S.Ct. 716, 728–29, 181 L.Ed.2d 694 (2013). These protections include the right to confront witnesses; the right to representation of counsel, who may expose flaws in identification testimony on cross-examination and closing argument; the right to jury instructions advising use of care in appraising identification testimony; and the requirement of proof beyond a reasonable doubt.

*Id*.

Although the application of *Mason* and *Biggers* to first-time in court identifications remains unsettled throughout the circuits, one thing is clear: that the Supreme Court has not extended their application to first-time, in-court identifications. *See Luckett*, 200 F. App'x at 704; *Rice v. Warden, Leath Corr. Inst.*, No. 216CV02610RBHMGB, 2017 WL 9250337, at *21 (D.S.C. July 31, 2017), *report and recommendation adopted*, No. 2:16-CV-02610-RBH, 2017 WL 4250180 (D.S.C. Sept. 26, 2017) (citing *Gunnels v. Cartledge*, 669 F. App'x 165, 165-66 (4th Cir. Oct. 12, 2016)); *Anderson v. Horton*, No. 2:19-CV-12546, 2020 WL 6504654, at *6 (E.D. Mich. Nov. 5, 2020); *Carter*, 2022 WL 286179, at *5. *See also State of Ohio v. Dorsey*, 2021-Ohio-878, ¶ 32, (Ohio App. 6th Dist. Mar 19, 2021) ("Neither the United States Supreme Court nor the Ohio Supreme Court has directly addressed the question of the appropriate test for the admissibility of first-time, in-court eyewitness identification. The issue is relatively rare.").

Here, the Court need not determine whether the state court properly applied *Biggers* as there is no "clearly established Federal law, as determined by the Supreme Court of the United

18

States" extending *Mason* and *Biggers* to situations where an eyewitness identifies a defendant for the first time in trial. *See* 28 U.S.C. § 2254(d)(1). In the absence of any Supreme Court caselaw extending *Biggers* to first-time, in-court identifications, or any Ohio law to the same effect, Jenkins is unable to establish that Eanes's in-court identification should have been suppressed for being unduly suggestive. Instead, the reliability of Eanes's identification was properly left the determination of the jury following ordinary protections in trial.

Accordingly, admission of Eanes's in-court testimony against Jenkins is not grounds for habeas relief, because there are no Supreme Court cases that have extended the protections of *Biggers* and its progeny to cases where the eyewitness first identifies the petitioner in court.

The Court finds that Eanes's sole ground for relief is meritless and recommends that the petition be dismissed.

## V. Certificate of Appealability

### A. Legal Standard

A habeas petitioner may not appeal the denial of his application for a writ of habeas corpus unless a judge issues a certificate of appealability and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c) ("A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."). The "'petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The granting of a certificate of appealability does not require a showing that the appeal would succeed on any claim. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

### B. Analysis

Jenkins's sole ground for relief is meritless. If the Court accepts the foregoing recommendation, then Jenkins has not made a substantial showing of a denial of a constitutional right. He would then not be entitled to a certificate of appealability. Thus, I recommend that the Court not issue a certificate of appealability.

## VII. Recommendation

Jenkins's sole ground for relief is meritless. Thus, I recommend that the Court deny his petition in its entirety and not grant him a certificate of appealability.

DATED: April 21, 2023

                                                                                   *s/Carmen E. Henderson*
                                                                                    Carmen E. Henderson
                                                                                    United States Magistrate Judge

_____

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).